**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **5:15-cr-00098-AKK-JEO** |
| | ) | |
| **BRETT M. RUSSELL** | ) | |

## GOVERNMENT'S TRIAL BRIEF

The United States, by and through its undersigned counsel, hereby submits this trial brief for the assistance of the Court and counsel. This brief contains a summary discussion of the indictment, the government's evidence, the substantive legal principles relevant to the charges in the indictment, and anticipated evidentiary issues.

### I.    Indictment

On or about April 30, 2015, a federal grand jury in the United States District Court for the Northern District of Alabama returned a two-count indictment against Huntsville Police Department ("HPD") Officer Brett M. Russell ("the Defendant"). Count One of the Indictment charges that the Defendant violated 18 U.S.C. § 242 on December 23, 2011, in that, while acting under color of law, he willfully deprived G.H. (hereinafter "G.W.H.") of the right to be free from the deprivation of liberty

without due process, which includes the right not to be subjected to force amounting to punishment before be convicted of a crime.

Count Two charges that the Defendant, while employed by and acting on behalf of HPD, did knowingly falsify an incident /investigative report in relation to and in contemplation of a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the United States, in violation of 18 U.S.C. § 1519. Specifically, the Defendant falsely stated that G.W.H. kicked at officers and attempted to head butt officers while he was being transported to the Defendant's vehicle, that G.W.H. would not stop resisting arrest despite being told to do so, and that he was transported to the local Madison County Jail without incident, when in fact he had to be taken to the hospital before the jail would allow him to be admitted.

## II.    Summary of the Facts and the Government's Evidence

### a.  Case Facts

On the evening of December 23, 2011, HPD Officers Brett Russell ("the Defendant") and Amanda Carmean responded to a domestic violence call at the America's Best Value Inn, in Huntsville.   The Defendant and Officer Carmean were each in their own squad car, and the Defendant was accompanied by then-17-year-old Nicholas Hall, a participant in the HPD's "Ranger" ride-along program.   When they arrived at ABVI, the suspect, G.W.H., was no longer on the

premises.   However, a third HPD officer, Sean Bragg, located G.W.H. a short distance away, placed him in handcuffs without incident, and returned him to the ABVI parking lot where he was transferred to Officer Carmean's squad car, which was equipped with in-dash and backseat cameras.   After the transfer, Officer Bragg concluded that the officers had the situation under control and left the scene.

Officer Carmean did not initially turn on the cameras in her squad car, so there is no video depicting the first few minutes after G.W.H. was placed in Officer Carmean's squad car.   However, when the video is first turned on, G.W.H.—who is handcuffed behind his back in the backseat—appears belligerent, drunk, and unruly. He spits in the backseat of the squad car, curses and insults the officers, and kicks and head butts the dividing partition.   Yet, instead of transporting Hopkins to the jail immediately, as required by HPD policy, G.W.H. is kept waiting in the rear of the squad car for more than an hour.   For a significant portion of that time, G.W.H. was left unattended in the car (apparently with the windows up and the heat on) while the Defendant, Officer Carmean, and Ranger Hall talked to G.W.H.'s wife, M.H., and tried to find someone—either a relative or someone from the Alabama Department of Human Resources—in whose care the couple's children could be left because M.H. appeared to the officers to be under the influence of alcohol, potentially drugs, and was significantly impaired.

At some point while he was unattended—and about 20 minutes or so after he had been placed in the squad car—G.W.H. kicked out the rear driver-side window of Officer Carmean's squad car. After that, G.W.H. remains seated calmly in the back of the squad car until (as described below) he was violently extracted from the car.

When Officer Carmean and the Defendant later discovered that G.W.H. had kicked out a window, they decided that he should be leg shackled and transferred to the Defendant's squad car so that he could be transported to the jail. They also decided to call for back up to help with the leg shackling. In the meantime, Officer Russell became very angry. He can be heard on the video repeatedly threatening to do physical harm to Hopkins when backup arrived. He also at one point expressed how he would "articulate" a [false] justification for using force against Hopkins.

Backup did arrive several minutes later. Veteran HPD Officer Joshua Bates arrived at the scene with rookie HPD Officer Marcus Perry, whom Officer Bates was training. The video shows that, almost immediately thereafter, Officer Bates essentially takes control of the scene. He speaks with the already on-scene officers to make an assessment of the situation and then speaks with G.W.H. about being shackled and warning him not to spit or kick or otherwise try to assault the officers during the process. G.W.H. can be heard repeatedly assuring Officer Bates that he will comply and that he "ain't about all that" and will not cause a problem. Shortly thereafter,

however, the video shows the Defendant re-emerging from behind Officer Bates and violently pulling the handcuffed G.W.H. from the rear of the vehicle. Once he is secure on the ground, Russell unleashes a torrent of 7-8 punches into G.W.H.'s body, and can be heard telling G.W.H. to "stop resisting!" though all others on the scene agree that G.W.H. was not resisting. A few seconds later, as Officers Perry and Bates attempt to shackle Hopkins, Russell can be seen delivering at least three knee strikes into G.W.H., even though G.W.H. was still not resisting.

Ultimately, G.W.H. was shackled and transported to the back of the Defendant's squad car. The video gives no indication that he offered any resistance during the transfer, and it does not show him being unruly in any manner after he is placed in the squad car. Soon thereafter, the Defendant and Ranger Hall transported G.W.H. to the Madison County Jail where he was not allowed to book Hopkins until after he had been examined at a hospital. Nonetheless, both the Defendant and Officer Carmean—the only two officers to file reports of the incident—omitted any mention of the use of force against G.W.H., and the Defendant omitted that he had to take Hopkins to the hospital before he could be admitted to the jail. The Defendant also made statements in the report that clearly misstate the G.W.H.'s actions at the time and immediately after he was assaulted.

### b. Government's Evidence

The government's evidence will consist primarily of testimony from witnesses who were present during the Defendant's alleged criminal misconduct while on duty as an HPD officer. That witness testimony will be supported by video evidence from the rear seat and front dash of Officer Carmean's squad car and the accompanying audio from those videos which establish that the Defendant planned his unconstitutional attack on G.W.H. The government will also present copies of the incident and arrest report the Defendant and Officer Carmean filed, G.W.H.'s medical records from Huntsville Hospital showing the injuries he suffered, records from G.W.H.'s booking into the Madison County Jail, and other documentary evidence.

The witness testimony, video, and documents will establish that (1) the Defendant was on duty as an HPD officer when he assaulted G.W.H., who was handcuffed and posing no threat at the time; (2) the Defendant was trained in the use of force and that the force used was excessive, unjustified, and served no legitimate law enforcement purpose; (3) the Defendant's actions were willful and were motivated by his desire to retaliate against or to punish G.W.H.; and (4) that G.W.H. suffered injury as a result of the Defendant's actions. Further, the evidence will show that the report the Defendant filed was materially false and that the Defendant

knew it was materially false.

### III.  Elements of the Indicted Counts

### a.  18 U.S.C. § 242(Deprivation of Civil Rights Under Color of Law)

#### i.  *Color of Law*

Section 242 requires that the alleged criminal wrongdoing be committed "under color of any law."   A defendant acts "under color of law" when he exercises power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.   West v. Atkins, 487 U.S. 42 (1988); Williams v. United States, 341 U.S. 97, 71 (1951).   Color of law means "pretense of law" and does not necessarily mean under authority of law.   Screws v. United States, 325 U.S. 91, 111 (1945); United States v. Picklo, 190 Fed. Appx. 887, 888 (11th Cir. 2006) (unpublished); United States v. Jones, 207 F.2d 785, 786-87 (5th Cir.1953).   If a defendant is possessed of state authority and purports to act under that authority, he acts under color of law, even if he abuses or misuses his power by going beyond the bounds of his lawful authority.   Griffin v. Maryland, 378 U.S. 130, 135 (1964); Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001) (finding defendant acted under color of law because he invoked his authority as a law enforcement officer to create the opportunity to sexually assault the victim); Picklo, 190 Fed. Appx. at 888 (same, where defendant used his official

status to gain access to the victim's car to commit a robbery). "The dispositive issue is whether the official was acting pursuant to power [he] possessed by state authority or acting only as a private individual." Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001).

Here, the evidence will establish that the Defendant was on duty, wearing a badge, and acting pursuant to his state authority when he punched and kicked G.W.H. while he was handcuffed and posing no threat to the Defendant or anyone else. Furthermore, after the physical assault, the Defendant transported G.W.H. to the Madison County Jail where he filled out an incident and arrest report—further establishing that he was acting under color of state law at the time.

## ii. *Deprivation of a Federally Protected Right*

18 U.S.C. § 242 is not a source of substantive rights. Rather, the statute provides a means for vindicating rights conferred elsewhere. *See* United States v. Lanier, 520 U.S. 259, 265 (1997) (stating, in describing 18 U.S.C. §§ 241 and 242, that "in lieu of describing the specific conduct it forbids, each statute's general terms incorporate constitutional law by reference"); *Graham v. Connor,* 490 U.S. 386, 393-94 (1989) (interpreting § 242's civil counterpart, 42 U.S.C. § 1983). Thus, for Count One of the Indictment, the government will have to prove that the defendant violated federal law or the Constitution.

The federally protected right at issue is the right of a detainee not to be subjected to the use of excessive force by one acting under color of law.[1]   This right is guaranteed to all persons under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.   United States v. Stokes, 506 F.2d 771, 775 (5th Cir. 1975) ("There are numerous cases . . . which support the proposition that one's right to be free from unlawful assault by state law enforcement officers when lawfully in their custody has been made a definite and specific part of the body of due process rights protected by the fourteenth amendment of the Constitution.").   A defendant acting under color of law deprives a detainee of this right when he uses force that amounts to punishment.   Graham v. Connor, 490 U.S. 386, 395 n.10 (1989) ("It is clear . . . that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."); Bell v. Wolfish, 441 U.S. 520, 535-36 (1979) ("[U]nder the Due Process Clause, a detainee

---

1 The Indictment in this case implicates the Fourteenth Amendment, as developed further below.   *See Cottrell v. Caldwell,* 85 F.3d 1480, 1490 (11th Cir. 1996) (handcuffed arrestee considered a pre-trial detainee for purpose of determining which constitutional protection applied to his 42 U.S.C. § 1983 claim).   However, it could be argued that the victim in this case, G.W.H., was actually an arrestee at the time he was assaulted, thereby implicating the protections of the Fourth Amendment.   *See Vinyard v. Wilson,* 311 F.3d 1340 (individual who was pepper sprayed while in the backseat of a squad car while handcuffed was an arrestee—implicating the Fourth Amendment—for purposes of her § 1983 claim); *see also Garrett v. Athens-Clarke County, Ga.,* 378 F.3d 1275 (11th Cir. 2004) (individual who had been handcuffed but required further restraint due to additional resistance was an arrestee for purposes of his estate's § 1983 claim).   Courts have referred to the period between an initial handcuffing of a suspect and his appearance before a judicial officer as a "legal twilight zone," and the 11th Circuit has not clarified whether the Fourth Amendment or the Fourteenth Amendment applies in that circumstance.   Last month, the Supreme Court mitigated any relevant significant distinction between the two standards when it clarified that, whether the Fourth Amendment or the Fourteenth Amendment right is at issue, a violation of an individual's constitutional right can be established by "providing objective evidence that the challenged governmental action is not rationally related to a legitimate government objective or that it is excessive in relation to that purpose."   *Kingsley v. Hendrickson,* -- S. Ct. --, No. 14-6368, 2015 WL 2473447, *6 (S. Ct. June 22, 2015).

may not be punished prior to an adjudication of guilt in accordance with due process of law."); <u>Vineyard v. County of Murray</u>, 990 F.2d 1207, 1211 (11th Cir. 1993) ("[T]he law is well established that . . . the Due Process Clause of the Fourteenth Amendment . . . 'protects a pretrial detainee from the use of excessive force that amounts to punishment.'"). Factors bearing on whether the forces was used for the purpose of punishment, as opposed to a legitimate law enforcement purpose, include: (1) the need for force (if any); (2) the relationship between the need for force and the amount of force used; (3) the extent of the resulting injury; (4) the extent of the threat to the safety of the officers and others, as reasonably perceived by the responsible officer on the basis of facts known to him; and (5) any efforts made to temper the severity of a forceful response; and (6) the Defendant's motive. <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986) (identifying factors relevant to inferring intent to punish). It is not constitutionally permissible for law enforcement officers to use force to retaliate against a person in custody or to punish that person for past misconduct if—at the time force as used—it was not necessary to accomplish a legitimate law enforcement purpose. Similarly, an officer may never use force based upon an arrestee or detainee's verbal provocation, standing alone. *See e.g.,* <u>Skrtich v. Thornton</u>, 280 F.3d 1295, 1301-02 (11th Cir. 2002) (""[i]t is not constitutionally permissible for officers to administer a beating as punishment for a prisoner's past

misconduct. [...] In the absence of any evidence that any force . . . was necessary to maintain order or restore discipline, it is clear that [the victim's] Eighth Amendment rights were violated."); *see also* <u>United States v. Cobb</u>, 905 F.2d 784, 787 (4th Cir. 1990) (approving instruction in § 242 case involving a pretrial detainee that "[p]rovocation by mere insulting or threatening words will not excuse a physical assault by a law enforcement officer. Mere words, without more, do not constitute provocation or aggression on the part of the person saying those words. No law enforcement officer is entitled to use force against someone based on that person's verbal statements alone.")

Witnesses will testify, and the video will show, that the Defendant's use of force against G.W.H. was unjustified, excessive, and served no legitimate law enforcement purpose, and was primarily motivated by the Defendant's desire to punish and retaliate against G.W.H.

       iii.  *Willfulness*

A defendant's deprivation of a federally protected right must be willful.   A willful act for purposes of § 242 is a voluntary and intentional act committed either "in open defiance or in reckless disregard of a constitutional requirement."   <u>Screws</u>, 325 U.S. at 105; <u>see also</u> <u>United States v. Mohr</u>, 318 F.3d 613, 619 (4th Cir. 2003) (equating willfulness to acting with a "particular purpose" to violate a protected

right or "recklessly disregarding" the risk of doing so); United States v. Johnstone, 107 F.3d 200, 207-210 (3d Cir. 1997) ("'willful[ ]' in § 242 means either particular purpose or reckless disregard").    The defendant must appreciate that the conduct is wrong, but need not be thinking in constitutional terms or be familiar with the Constitution.    Screws, 325 U.S. at 106; United States v. Brown, 49 F.3d 1162, 1165 (6th Cir. 1995) ("The United States need not prove that the defendant actually knew it was a constitutional right being conspired against or violated."); see also Johnstone, 107 F.3d at 209-10; United States v. Hoffman, 498 F.2d 879, 882 (7th Cir. 1974); United States v. Koon, 34 F.3d 1416, 1449-50 (9th Cir. 1994), aff'd in part, rev'd in part, on other grounds, 518 U.S. 81 (1996).    In other words, the government must prove, quite simply, that the Defendant knew what he was doing was wrong and that he chose to do it anyway.

A defendant's conduct may be willful even if it was brief or unpremeditated, or if the defendant was motivated primarily by anger, hate, malice, frustration, revenge or some other emotion.    Koon, 34 F.3d at 1450; Hoffman, 498 F.2d at 882; Crews v. United States, 160 F.2d 746, 749-50 (5th Cir. 1947).    In fact, motivations unrelated to legitimate law enforcement objectives are themselves evidence of willfulness.

As with other specific intent crimes, the element of willfulness may be

inferred from all of the attendant circumstances.   <u>Screws</u>, 325 U.S. at 106.

Therefore, direct evidence of intent is relevant, but not necessary.

The government will establish that the Defendant's conduct was willful through the Defendant's own words and actions on the video and through witness testimony.   Specifically, the video will show that the Defendant made repeated comments to Officer Carmean and Ranger Hall about his plan to physically assault G.W.H. in retaliation for his earlier conduct during the process of transferring G.W.H. from Officer Carmean's squad car to the Defendant's squad car.   Law enforcement witnesses will testify that the Defendant was trained on the department's use of force guidelines and the use of force continuum that require any use of force to serve a legitimate law enforcement purpose and that prohibit beating an arrestee who was handcuffed behind his back, indicating that he would comply with commands, and posing no present threat to the law enforcement on scene.

### iv.  *Bodily Injury*

A violation of § 242 is a felony if bodily injury resulted from a defendant's acts.   "Bodily injury" means any injury, including one that causes only temporary physical pain.   While bodily injury is not defined in 18 U.S.C. §  242, Title 18 defines the term elsewhere as:

(A)  a cut, abrasion, bruise, burn, or disfigurement;

(B)  physical pain;

(C)  illness;

(D)  impairment of a function of a bodily member, faculty, or mental faculty;
     or

(E)  any other injury to the body, no matter how temporary.

*See, e.g.*, 18 U.S.C. §§ 831(f)(5) and 1365(h)(4); *see also* <u>United States v. Myers</u>,
972 F.2d 1566, 1572-73 (11th Cir. 1992) ("[B]odily injury means any injury to the
body, no matter how temporary.   Bodily injury also includes physical pain as well
as any burn or abrasion.").

The government will establish that G.W.H. suffered bodily injury through
witness testimony, medical records, and photographs.   Further, common sense will
establish that the mere force of the repeated blows with which the Defendant struck
G.W.H. would have caused him to suffer bodily injury.

### b.  <u>Count Two</u>:   18 U.S.C. § 1519 (False Entry in a Record or Document)

In Count Two of the Indictment, the Defendant is charged with violating
Title 18, United States Code, Section 1519. Section 1519, makes it a federal crime
for anyone to knowingly make a false entry in a record in order to impede an
investigation. The indictment alleges that the defendant knowingly made false
entries in an official document—the incident and arrest report he filled out after

arresting G.W.H.—with the intent to impede, obstruct and influence the investigation of a matter within the jurisdiction of the Federal Bureau of Investigation. Section 1519 states:

> Whoever knowingly ... conceals, covers up, falsifies, or makes a false entry in any record [or] document with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States ... or in relation to or contemplation of any such matter or case [shall be guilty of an offense against the United States].

18 U.S.C. § 1519.    In order to prove a violation of Section 1519 in Counts Two and Three, the United States must establish the following elements beyond a reasonable doubt:

1. The defendant made a false entry in a record or document;

2. The defendant did so knowing it was false; and,

3. The defendant did so with the intent to impede, obstruct, or influence the investigation of a matter within the jurisdiction of an agency of the United States (here, the FBI) of in relation to or contemplation of any such matter or case.

i. *Elements One and Two: Knowingly Making a False Entry in a Record or Document*

At trial, the government will introduce into evidence the incident and arrest report filed by the Defendant on December 23, 2011, in which he claims that, after kicking the window out of Officer Carmean's squad car, G.W.H. "began cursing and

spitting at officers," threatened Ranger Hall, and kicked at officers. The video will show, and witness testimony will confirm, that none of those things happened after G.W.H. kicked out Officer Carmean's squad car window, and in fact, after he did so, G.W.H. remained calm and compliant.

The incident and arrest report further states that, G.W.H. attempted to head butt officers while the officers attempted to transport G.W.H. from Officer Carmean's squad car to the Defendant's squad car. The video and witness testimony will show that G.W.H. did not attempt to head butt officers, and, in fact, that G.W.H. was in no position to make such an attempt because he was being restrained by three other officers while the Defendant was punching and kicking him.

Finally, the incident and arrest report claims that, after shackles were placed on G.W.H.'s feet, he was transported and booked into the Madison County Jail "without incident." Witness testimony and documentary evidence will establish, however, that the Madison County Jail refused to admit G.W.H. because they determined that he had been injured and required that he be taken to a hospital before he would be admitted.

### ii. *Element Three: With the Intent to Impede, Obstruct, or Influence*

The government must also establish that the Defendant filed the false

documents with the intent to impede, obstruct, or influence the investigation of a matter within the jurisdiction of the FBI. The government will present testimony that the Defendant and his classmates received training regarding federal civil rights laws, including excessive use of force while at the Huntsville Police Academy. Thus, the defendant knew that excessive force could constitute a federal crime within the jurisdiction of the FBI. It is not necessary for the government to prove that a FBI investigation was pending or imminent at the time of the defendant's conduct. United States v. Gray, 642 F.3d 371, 375-78 (2d Cir. 2011) ("Congress rejected any requirement that the government prove a link between a defendant's conduct and an imminent or pending official proceeding."); *see also,* S. REP. 107-146, at 14 (2002), 2002 WL 863249 (Leg.Hist.)

## IV.    Summary of Anticipated Legal Issues

To assist the parties and the Court in avoiding unnecessary delay and disruption at trial, the following discussion describes legal principles applicable to evidentiary issues that may arise during trial.

### a.  Jury Nullification

The government has strong evidence supporting the charges on both counts of the Indictment, including (1) the Defendant's own recorded statements prior to and after the assault confirming his motive and intent for intentionally using excessive

force against G.W.H. and (2) the Defendant's intentional actions to cover up that he used excessive force against G.W.H..   Thus, it is not unreasonable to anticipate that the Defendant and his counsel may make some reference, statement, argument, or question aimed at jury nullification.

"Jury nullification" occurs when a jury acquits a defendant based on some consideration other than an honest application of the facts to the law.   The jury's duty is to evaluate the facts in light of the Court's instruction on the law.   See United States v. Trujillo, 714 F.2d 102, 106 (11th   Cir. 1983).   "Although a jury is entitled to acquit on any ground, a defendant is not entitled to inform the jury that it can acquit him on grounds other than facts in evidence."   United States v. Muse, 83 F.3d 672, 677 (4th Cir. 1996) (holding "defense counsel is not entitled to urge the jury to exercise [the] power" of nullification).   Because any action taken by the jury to disregard the law would be a "dereliction of the jury's sworn duty," United States v. Funches, 135 F.3d 1405, 1408 (11th Cir. 1998), the Defendant and his counsel must, at all times, limit their statements and arguments to "principles that will later be incorporated and charged to the jury."   Trujillo, 714 F.2d at 106; see also United States v. Moylan, 417 F.2d 1002, 1006 (4th Cir. 1969); United States v. Sepulveda, 15 F.3d 1161, 1190 (1st Cir. 1993) (holding that a trial judge "may block defense attorneys' attempts to serenade the jury with a siren song of nullification").

Accordingly, the Defendant, his counsel, and any witness must not be allowed to make any reference, statement, argument, or question that: (1) proposes G.W.H. is unworthy of the law's protection; (2) any potential sentence the Defendant may face if convicted; (3) any potential employment consequences the Defendant has suffered or may suffer as a result his involvement in this incident; or (4) any other statements or insinuations that would suggest to the jury that it could and should decide the case on any basis other than honestly applying the facts of the case to the law provided them by the Court.

### b. Character Evidence

The government anticipates that the Defendants may introduce evidence regarding his own character, as well as the character of G.W.H. and certain government witnesses. The use of character evidence is sharply constrained by the Federal Rules of Evidence. Rule 404 of the Federal Rules of Evidence sets forth the well-known general prohibition on the use of character evidence as proof that a person acted a certain way on a specific occasion. Fed. R. Evid. 404(a). The Rules strongly discourage the admission of character evidence because:

> [Character evidence] is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on a particular occasion. It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in

the case shows actually happened.

Advisory Committee Notes to Fed. R. Evid. 404.    Thus, although the Rules permit the admission of some character evidence, strict limitations govern both the types of character evidence that may be considered and the means by which it may presented at trial.    Additionally, as with any evidence, character evidence must make the existence of a fact of consequence to the determination of the case more or less probable, in accordance with Fed. R. Evid. 401, and its probative value must be balanced against the dangers of unfair prejudice, confusion of issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence, in accordance with Fed. R. Evid. 403.    The Court also may, in its discretion, limit the number of character witnesses.    <u>Michelson</u>, 335 U.S. at 480.

The government has filed motions in limine (*see* Dkt. 16 and Dkt. 19) that address in greater detail the character evidence the government anticipates the Defendant may offer and the circumstances such evidence is and is not appropriate. For the reasons outlined in those motions, the government requests the Court (1) prohibit evidence, argument, or reference to specific instances of good conduct of the Defendant (including in voir dire and in opening statements); and (2) prohibit the Defendant from introducing evidence of, making any reference to, or making any arguments about victim G.W.H.'s prior arrests and any other specific acts of

misconduct by G.W.H.

### c. Redaction of Certain Statements from Video of Incident

The video of the incident that led to the Indictment is more than one hour long.   The video shows clearly the Defendant's beating G.W.H. as well as the statements and conduct of the victim and the officers on the scene that evening. Many of the statements captured on the video are directly related to the willfulness of the Defendant's conduct.

However, the video also contains (1) segments of conversation between the Defendant, Officer Carmean, and the victim's wife, M.H., about the relationship between G.W.H. and M.H., the presence of domestic violence in their relationship, and the officers' concern for the well-being of their then-5-year-old children; and (2) one-sided segments of telephone conversations between Officer Carmean and other individuals regarding her concern for the well-being of the victim's children and her efforts to find care for them that evening.

Those statements are not relevant to any issues before the jury.   They do not relate in any relevant way to any elements of the crimes with which the Defendant is charged, nor do they provide any <u>relevant</u> context for the Defendant's conduct that night.   They may, however, emotionally inflame the jurors and tempt them to make decisions based on factors that are not in accordance with the Court's instructions.

As set forth more fully in the government's motion in limine addressed to this issue (*see* Dkt. 20), the government believes those portions of the video should be redacted from the video.

### d. Authenticity of Exhibits

The government anticipates offering exhibits at trial. These exhibits will largely consist of videotapes, audio recordings, medical records, photographs, documents pertaining to HPD use of force training and policies, and incident and arrest reports filed by the Defendant and other officers related to the arrest. The government intends to request that the Defendant stipulate to the authenticity of such exhibits before trial.

The government is prepared to call the witnesses necessary to authenticate these exhibits. However, the government also believes that doing so will be an inefficient and time-consuming use of the Court's and the jury's time. To avoid unnecessarily imposing this burden, the government requests that the Court address this issue before trial to determine whether there is any bona fide issue regarding the authenticity of exhibits that would warrant the trial time and resources required for contested authentication.

Respectfully submitted,

JOYCE WHITE VANCE
United States Attorney


*/s/ XAVIER O. CARTER, SR.*
XAVIER O. CARTER, SR.
Assistant United States Attorney
1801 Fourth Avenue North
Birmingham, AL 35203
(205) 244-2001



/s/ *Carroll McCabe*
CARROLL MCCABE
Trial Attorney
U.S. Department of Justice
Civil Rights Division Criminal Section
601 D Street, NW
Washington, DC 20004
(202) 514-5123
carroll.mccabe@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on July 20, 2015, I filed this document electronically with the United States District Court for the Northern District of Alabama using the CM/ECF system and thereby caused a copy to be served on the defendant's counsel of record.

/s/ *XAVIER O. CARTER, SR.*
XAVIER O. CARTER, SR.
Assistant United States Attorney